IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

THERESA FERGUSON and KATE FERGUSON,

Plaintiffs,

v.

LON SLONAKER and GUNDERSON FUNERAL HOME, INC,

Defendants.

OPINION and ORDER

25-cv-287-jdp

---

This negligence case arises from a motor vehicle collision in Madison, Wisconsin. Defendant Lon Slonaker was driving a hearse on behalf of defendant Gunderson Funeral Home, Inc. when he rear-ended a car occupied by plaintiffs Theresa and Kate Ferguson, which was stopped at a red light. The case is scheduled for trial beginning October 5, 2026.

This order addresses the pending motions to exclude expert testimony. The court will rule on the parties' other motions in limine before the September 30 final pretrial conference.

ANALYSIS

Both sides have moved to exclude testimony from the other side's expert witnesses. Expert testimony must comply with the five requirements in Federal Rule of Civil Procedure 702:

1) the witness is qualified as an expert by knowledge, experience, training, or education;

2) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

3) the testimony is based on sufficient facts or data;

4) the testimony is the product of reliable principles and methods; and

5) the expert has reliably applied the principles and methods to the facts of the case.

*See Burns v. Sherwin-Williams Co*., 78 F.4th 364, 373 (7th Cir 2023). The court of appeals has distilled these requirements into three questions: (1) is the expert qualified to give the testimony at issue? (2) did the expert use a reliable method to reach his or her conclusions? and (3) is the expert testimony relevant? *See Gopalratnam v. Hewlett-Packard Co.,* 877 F.3d 771, 779 (7th Cir. 2017).

As for qualifications, the question is not whether the expert is generally qualified in his or her field, but whether the expert has the necessary education and training to draw the conclusions he or she offers in the case at hand. *See Hall v. Flannery*, 840 F.3d 922, 926 (7th Cir. 2016). Experts may testify on the basis of practical experience as well as on the basis of formal education. *Bryant v. City of Chicago*, 200 F.3d 1092, 1098 (7th Cir. 2000); *Walker v. Soo Line R. Co.*, 208 F.3d 581, 591 (7th Cir. 2000).

The test for reliability is necessarily flexible. In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), the Supreme Court identified facts that the court may consider when determining whether an expert's testimony is reliable—whether the expert's technique has been tested, subjected to peer review and publication, analyzed for errors, or is generally accepted—but these factors "neither necessarily nor exclusively appl[y] to all experts or in every case." *Gopalratnam*, 877 F.3d at 779–80. The reliability inquiry focuses on the expert's methodology; that is, whether the expert exercised "soundness and care" in reaching his opinions. *Timm v. Goodyear Dunlop Tires N. Am., Ltd.*, 932 F.3d 986, 993 (7th Cir. 2019). The inquiry does not ask whether the expert's ultimate conclusions are correct. "The soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's

conclusions based on that analysis are factual matters to be determined by the trier of fact." *Gopalratnam*, 877 F.3d at 781 (quoting *Smith v. Ford Motor Co.*, 215 F.3d 713 (7th Cir. 2000))

Finally, expert evidence is relevant if it helps the jury understand a matter beyond the knowledge and experience of a layperson. *Daubert*, 509 U.S. at 591–92 ("Rule 702's 'helpfulness' standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility."). Bottom-line conclusions are not helpful and must be excluded if the expert fails to explain how those conclusions are supported by the existing data. *Zamecnik v. Indian Prairie School Dist. No. 204*, 636 F.3d 874, 881 (7th Cir. 2011) ("Mere conclusions, without a hint of an inferential process, are useless to the court." (internal quotation marks and citation omitted)). Expert testimony is also irrelevant if it does not help the jury decide the facts at issue in the case. *Ancho v. Pentek Corp.*, 157 F.3d 512, 515 (7th Cir. 1998) (quoting *Wintz v. Northrop Corp.*, 110 F.3d 508, 512 (7th Cir. 1997)).

Federal Rule of Civil Procedure 26 requires a complete and detailed disclosure of the expert's opinions and the reasons for them in a timely expert report. *Salgado by Salgado v. Gen. Motors Corp.*, 150 F.3d 735, 741 n.6 (7th Cir. 1998). Thus, the court's analysis of the admissibility of an expert's testimony is based on the opinions, conclusions, and the basis and reasons for them in the expert's report. *Ciomber v. Coop. Plus, Inc.*, 527 F.3d 635, 642 (7th Cir. 2008). An expert may not cure deficiencies in his report with later deposition testimony. *Id.* The proponent of expert evidence bears the burden of establishing that the expert's testimony is admissible. *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009).

**A. Brian Greenwald**

Brian Greenwald is a physical medicine and rehabilitation doctor who specializes in brain injury medicine. Plaintiffs retained Greenwald to offer opinions about the nature of Theresa Ferguson's injuries and whether they were caused by the motor vehicle crash at issue in this case. Greenwald examined Theresa and reviewed medical records from six providers who treated her after the motor vehicle crash. Greenwald concluded that Theresa had suffered a whiplash injury and a mild traumatic brain injury (mTBI) during the crash, which had left her with permanent disabilities, including headaches, light and noise sensitivity, and cognitive impairment. Dkt. 55 (Greenwald report).

In his report, Greenwald acknowledged that Theresa did not have objective clinical or laboratory findings to corroborate a diagnosis of mTBI, nor did she suffer the hallmark acute symptoms of mTBI, such as loss of consciousness or short-term amnesia. Instead, Greenwald relied on Theresa's reported symptoms in the weeks and months following the crash, reasoning that they were consistent with whiplash and mTBI. Greenwald noted that Theresa reported headache and neck stiffness and generally "not feeling well" after the crash. Then, beginning about a week after the crash, Theresa experienced dizziness and vertigo when bending over, followed by headaches, brain fog, noise and light sensitivity, motion sickness, vertigo, and problems with balance. Greenwald explained that these were "common concussive symptoms," so Theresa was "appropriately diagnosed with having suffered a concussive brain injury as a result of the motor vehicle collision on 01/27/2024." Dkt. 55, at 16.

Defendants contend that Greenwald didn't employ a reliable methodology in concluding that Theresa's symptoms were caused by mTBI and whiplash, for two reasons. First, defendants say that Greenwald did not follow the American College of Rehabilitation Medicine

(ACRM) criteria for diagnosing mTBI. Second, defendants say that Greenwald did not attempt to rule out alternative explanations for Theresa's symptoms.

As for the ACRM criteria, plaintiffs agree that Greenwald did not apply those criteria in diagnosing Theresa with mTBI, but they assert that Greenwald never intended to use the ACRM criteria and that it was not mandatory for him to do so. The court agrees with plaintiffs on this point. Although Greenwald cited the ACRM criteria as a general reference, he never purported to use the criteria as the basis for his diagnosis. And nothing in the literature that Greenwald or the parties cite suggests that the ACRM criteria are the exclusive means to diagnose mTBI. On the contrary, the authors of the ACRM criteria acknowledged that the method would not be feasible in all clinical settings, and they encouraged clinicians "to use all information available to them and their clinical judgment to identify and medically manage a case that does not clearly fit the criteria." Noah Silverberg et al., *The American Congress of Rehabilitation Medicine Diagnostic Criteria for Mild Traumatic Brain Injury*, Archives Phys. Med. Rehab. 1343, 1353 (2023). The court will not exclude Greenwald's opinions on the basis that he did not use the ACRM criteria.

That leaves defendants' argument that Greenwald did not consider alternative explanations for Theresa's symptoms. The parties agree that Greenwald used a differential etiology method to render his opinion about the cause of Theresa's symptoms.[1] Differential

[1] In their briefs, both parties describe Greenwald's method as "differential diagnosis," not differential etiology. But differential diagnosis is the process of identifying a patient's medical condition from two or more diseases with similar symptoms. *Happel v. Walmart Stores, Inc.*, 602 F.3d 820, 825 n.7 (7th Cir. 2010). When a medical expert offers an opinion on the *cause* of a patient's medical condition, then the method is more appropriately called "differential etiology." *Myers v. Illinois C. R. Co.*, 629 F.3d 639, 644 (7th Cir. 2010). Greenwald concluded both that Theresa had mTBI and that it was caused by the January 2024 car crash, so his method was differential etiology, not differential diagnosis.

etiology is an accepted and valid method in which a physician expert "rules in all the potential causes of a patient's ailment and then by systematically ruling out causes that would not apply to the patient, the physician arrives at what is the likely cause of the ailment." *Myers v. Illinois C. R. Co.*, 629 F.3d 639, 644 (7th Cir. 2010). Defendants argue that Greenwald didn't properly apply the method here, because he didn't systematically rule out alternative explanations for Theresa's symptoms.

The court agrees with defendants. Greenwald concluded that Theresa must have suffered an mTBI during the motor vehicle crash because her symptoms in the weeks and months after were consistent with an mTBI. But Theresa's medical records suggest that her symptoms were also potentially consistent with uncontrolled hypertension, so Greenwald's failure to rule that out demonstrates a failure to apply a systematic approach. Greenwald noted in his report that Theresa had preexisting hypertension and that her blood pressure was 157/94 on February 9, 2024, two weeks after the crash. Dkt. 55, at 2,13. At that time, Theresa's primary care provider thought that her high blood pressure might be causing her dizziness and vertigo, so the provider increased the dosage of Theresa's blood pressure medication in an effort to relieve her symptoms. Greenwald did not say whether that effort was successful or whether Theresa's blood pressure problems continued during the next several months.

Plaintiffs say that Greenwald ruled out the possibility that Theresa's symptoms were caused by her hypertension because he wrote in his report that Theresa's hypertension was "controlled," Dkt. 55, at 13, and that her elevated blood pressure on February 9 was likely "due to pain and physical stressors of concussion." *Id.* at 16. But "mere conclusions, without a hint of inferential process, are useless to the court." *Zamecnik*, 636 F.3d at 881. Greenwald didn't explain the basis for either of his statements about Theresa's hypertension. In his

deposition, Greenwald testified that he didn't remember reviewing any medical records from before the crash, Dkt. 54 (Greenwald Dep. 55:21–24), so it's not clear how he could have concluded that Theresa's hypertension was "controlled" before the crash. And Greenwald provided no explanation whatsoever for his belief that Theresa's elevated blood pressure on February 9 was a byproduct of mTBI as opposed to an alternate cause of her symptoms. Greenwald's report contains no explanation of how he analyzed and "ruled out" hypertension as a cause of Theresa's symptoms. That's a fatal flaw in his methodology.

Plaintiffs cite *Gayton v. McCoy*, 593 F.3d 610 (7th Cir. 2010), and *Schultz v. Akzo Nobel Paints, LLC,* 721 F.3d 426 (7th Cir. 2013), for the proposition that an expert does not have to eliminate every possible alternate cause when conducting a differential etiology. But *Gayton* and *Schultz* hold that if multiple alternative factors might contribute to a plaintiff's injury, an expert conducting a differential etiology can explain how he weighed their relative contributions without conclusively excluding them. *See Schultz*, 721 F.3d at 533; *Gayton*, 593 F.3d at 618–19; *see also Brown v. Burlington N. Santa Fe Ry. Co.*, 765 F.3d 765, 773–74 (7th Cir. 2014) (discussing *Gayton* and *Schultz*). The expert must still investigate obvious alternatives and rule them out if they might call into question his ultimate conclusion about causation. *See Brown*, 765 F.3d at 774 (excluding an expert's differential etiology because "it is not clear that he ruled out any serious alternative").

Plaintiffs also argue that Greenwald's failure to consider Theresa's hypertension is not a basis for exclusion because one of Theresa's treating physicians, Anthony Savino, said in his deposition that he considered her hypertension and didn't think it contributed to her symptoms. Dkt. 48 (Savino Dep. 45:1–10). But Savino didn't explain why he thought that, and it's apparent from the information that Greenwald reviewed that some of Theresa's

providers, such as her primary care provider, *did* think her hypertension might be a contributing factor. In any event, Greenwald did not discuss Savino's opinion in his report. The fact that another expert whose opinion Greenwald did not consider believes that hypertension did not play a role in Theresa's symptoms does not relieve Greenwald of his obligation to discuss and rule out that alternative cause. *See* Fed. R. Civ. P. 26(a)(2); *Ciomber*, 527 F.3d at 642 (experts must discuss the bases for their opinions in their reports).

In sum, the court concludes that Greenwald did not apply a reliable differential etiology method in concluding that Theresa's symptoms were caused by whiplash and mTBI that she suffered during the motor vehicle crash. The court will grant defendants' motion to exclude Greenwald's testimony.

**B. Sepehr Sani**

Sepehr Sani is a neurosurgeon who defendants retained to offer an opinion as to whether Theresa's symptoms were caused by the motor vehicle crash. Sani reviewed the accident report and photographs of the crash, medical records for Theresa from before and after the crash, and Brian Greenwald's expert report. Sani concluded that (1) Theresa did not suffer a brain injury during the crash, and (2) her neurological complaints were not otherwise caused by the car crash.

Plaintiffs don't challenge either of Sani's bottom-line conclusions under Rule 702. But they want to prevent Sani from testifying on eight other issues, most of which are explanatory context for his opinions that Sani offered during his deposition.[2]

[2] These are plaintiffs' motions in limine 1–8. Dkt. 42.

Before turning to the specific testimony that plaintiffs want to exclude, the court begins with a general issue. Under Federal Rule of Civil Procedure 26(a)(2)(B), an expert's written report must contain a complete statement of his opinions, including the reasons for them. An expert whose report insufficiently explains his opinions may not cure the problem with later deposition testimony. *Ciomber*, 527 F.3d at 642.

At the same time, an expert's report does not need to include every word that the expert will say on the stand. *Walsh v. Chez*, 583 F.3d 990, 994 (7th Cir 2009). An expert can offer testimony in his deposition or at trial that clarifies the opinions and reasons in his written report, as long as the clarifications are fairly within the scope of the report. *See Moore v. State Farm Fire and Cas. Co.*, No. 18-cv-539, 2020 WL 915806 (E.D. Wis. Feb. 26, 2020) (declining to strike opinions that an expert gave during his deposition because they were not new opinions, but clarification of existing opinions in response to questioning by plaintiff's counsel).

Here, although many of the challenged opinions don't appear in Sani's written report, the court does not see a reason to exclude them on that basis. (There is one exception that the court will discuss later.) Sani did not provide new opinions outside the scope of his report in the challenged portions of his deposition; he simply clarified the opinions and reasons in his report in response to questioning by plaintiffs' counsel.

1. **Testimony that Theresa's mTBI diagnosis was "copy and pasted" in her medical records**

Plaintiffs want to bar Sani from testifying that Theresa's treating physicians "copied and pasted" an mTBI diagnosis in her records. Sani didn't say that in his expert report, but he said it in his deposition when he was asked how he reconciles his opinion with the diagnoses of physicians who examined Theresa. Sani explained:

> It's a fantastic question actually because it gets to one of the main culprits and weaknesses of medicine in the sense that what actually happens in many cases is there is a diagnosis of concussion provided in the medical record by a provider after a patient or examinee goes and says, look, I have such and such symptoms, they started after a car accident and this looks like a concussion so they put concussion as a diagnosis.
>
> Unfortunately that diagnosis gets copied and pasted by anyone who that patient is referred to by that care provider oftentimes, and it "sticks," meaning that all the subsequent providers do not put the patient through a thorough review of the exact sequence of events. Rather, they are treating somebody who has already been in their minds treated by somebody before, and so you have to understand that this is not an individual who has repeatedly rediagnosed with a concussion.

Dkt. 42-1 (Sani Dep. 108:1–22). Plaintiffs argue that this testimony amounts to speculation about what Theresa's medical providers did, that it is an impermissible credibility attack on Theresa and her providers, and that its probative value is substantially outweighed by the risk of unfair prejudice.

The court will deny the motion to exclude this testimony. Sani isn't offering a formal opinion here about how diagnoses appear in medical records; he's explaining why he didn't credit the mTBI diagnoses that Theresa's treating providers put in her medical records. Sani is entitled to explain how he considered Theresa's medical records in reaching his ultimate conclusion that Theresa did not have an mTBI; in fact, he's required to do that. *Downing v. Abbott Laboratories*, 48 F.4th 793, 809 (7th Cir. 2022) (experts must "bridge the analytical gap" by showing a "rational connection" between the data and the expert's conclusion) (internal quotations omitted). Nor does the court see any risk of unfair prejudice here. If Sani testifies about medical providers "copying and pasting" diagnoses, plaintiffs' counsel can establish on cross examination that that's Sani's general belief about how medical records work, not an opinion derived from actual knowledge about the charting practices of Theresa's treating

providers. Plaintiff's counsel can also offer Theresa's treating providers as witnesses, so they can testify directly about why they put an mTBI diagnosis in her medical record.

**2. Testimony about the nature of the car crash**

Plaintiffs want to prevent Sani from offering "biomechanical, accident-reconstruction, and vehicle-damage opinions." Dkt. 42, at 6. Plaintiffs appear to be referring to Sani's observations that the motor vehicle crash was "low-speed" and "minor" based on the incident report and photographs of the parties' vehicles. Dkt. 46, at 9–10. Plaintiffs contend that Sani is not qualified to testify about the nature of the crash because he is not an engineer or biomechanical expert and did not apply a valid method to analyze the nature of the crash.

The court will deny the motion to exclude this testimony, because Sani's observations about the nature of the crash are part of the factual basis for his medical opinions. It is common for experts to assume the existence of certain facts that have to be proven by other witnesses and to render opinions based on those assumed facts. *See Williams v. Illinois*, 567 U.S. 50, 57 (2012) ("Under settled evidence law, an expert may express an opinion that is based on facts that the expert assumes, but does not know, to be true. It is then up to the party who calls the expert to introduce other evidence establishing the facts assumed by the expert."). That's what Sani's doing here. Defendants plan to offer a mechanical engineering expert who will testify that the speed of defendant's car at the time of impact was no more than nine miles per hour. Dkt 56 (expert report of Santos Reyes). Defendants will also likely elicit testimony from defendant Lon Slonaker that he was moving slowly when the crash occurred. Because defendants plan to establish that the crash was low speed via other witnesses, Sani may assume that fact and explain how it figured into his conclusion that Theresa did not suffer an mTBI.

Plaintiffs also assert that any testimony about the crash speed has limited probative value because Sani admitted in his deposition that concussions can occur even in low-speed crashes. The court disagrees. Both parties' medical experts discussed the speed and other forces that Theresa may have experienced during the crash in evaluating her injury, and the medical literature that those experts cited confirms that that is a relevant consideration. *See* Silverberg et al., *The American Congress of Rehabilitation Medicine Diagnostic Criteria for Mild Traumatic Brain Injury* at 1348 (noting that a TBI diagnosis must have a "biomechanically plausible mechanism of injury"). Plaintiffs are correct that Sani testified in his deposition that an mTBI can occur even in a low-speed crash. Dkt. 42-1 (Sani Dep. 68:13–16). But that doesn't make the speed of the crash irrelevant. As Sani explained, "the forces and mechanisms around an accident in general are one of the factors that are considered" in evaluating the likelihood that a patient suffered an mTBI. *Id.* at 68:22–24.

**3. Psychiatric opinions**

Plaintiffs next seek to bar Sani from offering "psychiatric, psychological, and neuropsychological opinions." Sani didn't offer any opinions of this type in his expert report, but plaintiffs point to a portion of his deposition testimony as an example of what they want to exclude. In that testimony, Sani explained why he decided not to interview or examine Theresa as part of his evaluation of her medical condition:

> The symptom patterns are well-documented and the lack of improvement are well-documented as well as a neuropsychological evaluation that revealed a functional disorder that suggests that there is a cognitive process, whether it's psychological, psychiatric or other, at play here.
>
> And as such, I felt that if I interview or examine Ms. Ferguson, I am not going to find much of a neurological examination because she has had a year-and-a-half or two years of neurological examinations. She's already undergone an excellent

> neuropsychological evaluation. And also if she does have a functional disorder, she is more likely to report to me the same symptoms she has repeatedly told all her care providers in the medical records.

Dkt. 42-1 (Sani Dep. 89:20–90:13).

Plaintiffs say that Sani should be barred from testifying that Theresa has a functional disorder, because Sani is not qualified to diagnose psychological conditions, so if he testified about those conditions, he would be acting an improper "mouthpiece" of Theresa's psychological providers. Dkt. 42, at 9 (quoting *Dura Auto. Sys. of Ind., Inc. v. CTS Corp.*, 285 F.3d 609, 614 (7th Cir. 2002)). In response to this motion, defendants ask that it be denied as unnecessary because "[i]t is not anticipated that Dr. Sani will be offering any specific opinions in these areas of study." Dkt. 65, at 4. Although defendants don't say what "these areas of study" means, the court takes defendants to be saying that Sani will not testify that Theresa was diagnosed with a functional disorder. The court will grant plaintiffs' motion as unopposed. If the parties need additional clarification, they can request it at the final pretrial conference.

**4. Alternative causation opinions**

In his deposition, Sani denied forming an opinion about the cause of Theresa's symptoms other than that they were not related to a concussion or other neurological incident stemming from the motor vehicle crash. Dkt. 42-1 (Sani Dep. 125:4–8). Relying on that testimony, plaintiffs seek to bar Sani from testifying about potential alternative causes of her symptoms, such as uncontrolled hypertension, migraines, or stress. Sani did not offer these as potential causes in his expert report, but he suggested them during his deposition when asked hypothetical questions about conditions that might cause symptoms similar to Theresa's.

The court will grant the motion to exclude this testimony in part and deny it in part. Sani did not offer an opinion about alternative causes for Theresa's symptoms in his report, even as hypothetical possibilities, so testimony to that effect would be outside the scope of his report and thus inadmissible. But if plaintiffs' counsel asks Sani on cross-examination whether other conditions might cause similar symptoms, as she did during Sani's deposition, then Sani may answer that question.

**5. Opinions about Ferguson's functional impairments**

Plaintiffs want to prevent Sani from testifying about Theresa's "day-to-day functioning, impairment or disability." Dkt. 42, at 11. The court will grant the motion as unopposed because defendants say that Sani will not offer any opinions about Theresa's functional impairments.

One point of clarification is necessary. In their motion, plaintiffs say that Sani made an offhand observation in his deposition that Theresa "continued to drive," which they say is the type of comment that should be barred. Defendants counter that that was not an offhand observation: Sani discussed Theresa's driving after plaintiffs' counsel directly asked him whether the fact that Theresa continued to drive after the accident would change his opinion about whether she suffered an mTBI. Dkt. 42-1 (Sani Dep. 82:5–21). The court has already explained that experts can testify about the factual bases for their opinions. Sani can testify about how his understanding of Theresa's functional abilities factored into his opinion about whether she suffered an mTBI. He cannot offer independent opinions about Theresa's functional impairments.

**6. References to Sani being an "independent" expert or conducting an "independent medical examination"**

The court will grant this motion as unopposed.

**7. Undisclosed materials**

Under Federal Rule of Civil Procedure 26(a)(2)(B), a retained expert must provide a written report containing (1) a complete statement of the expert's opinions; (2) the facts or data the expert considered; (3) exhibits that the expert will use to summarize or support his opinions; (4) the expert's qualifications, including publications authored in the previous 10 years; and (5) a list of cases in which the expert testified in the last four years; and (6) a statement about the expert's compensation. Plaintiffs say that Sani didn't fully comply with Rule 26(a)(2)(B) in submitting his written report, and they ask that he be barred from offering certain testimony as a result.

Specifically, plaintiffs assert that Sani should be prohibited from offering testimony about two issues that plaintiffs say weren't disclosed. First, plaintiffs say that Sani provided an out-of-date version of his CV with his written report, so he should be prevented from testifying about any credentials that weren't in the disclosed CV. Second, Sani did not include the depositions of treating providers Alia Ammar and Anthony Savino in the list of materials that he reviewed, but he testified that he reviewed transcripts of those depositions after he submitted his written report and that they did not change his opinion. Plaintiffs say that Sani

should be prohibited from referring to or relying on Ammar and Savino's depositions because they weren't disclosed in his written report. Dkt. 42, at 15.[3]

The court will deny this motion. Rule 26(e) allows parties to supplement or correct disclosures, including expert reports, "in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing." Defendants provided plaintiffs with Savino's updated CV within hours of learning that the CV in his written report was not current. And Sani promptly disclosed in his deposition that he had reviewed Ammar and Savino's deposition transcripts after submitting his written report. There is no violation of the disclosure rules here.

**8. Speculations about lay witnesses' observations of Theresa's symptoms**

Finally, plaintiffs seek to prevent Sani from testifying that Kate Ferguson and other lay witnesses did not observe Theresa experiencing symptoms of an mTBI after the car crash. In his expert report, Sani explained that one of the reasons he believed that Theresa did not suffer an mTBI was that she did not report symptoms until nearly a week-and-a-half after the crash. Sani wrote:

> Ms. Ferguson was involved in a low-speed motor vehicle accident on January 27, 2024 . . . There are no records to indicate Ms. Ferguson reported any neurological symptoms in the immediate aftermath or the first few days after the accident. There are also no records indicating Ms. Ferguson seeking any medical care, either directly or by request of a care provider or family member (as is commonly seen in mild traumatic brain injury cases). In

[3] Plaintiffs also say that Sani's written report was deficient in a few other respects. For instance, they say that Sani didn't know at his deposition whether the fee schedules the defendants produced were an accurate description of his fees. But plaintiffs don't ask for any specific relief related to these alleged deficiencies, so the court need not discuss them further.

> other words, there is no indication that Ms. Ferguson experienced common symptoms of a concussion.

Dkt. 46, at 10. Plaintiffs say that Sani is just speculating here, because he has no way to know whether Theresa's family or friends may have noticed symptoms or encouraged Theresa to seek medical care.

The court will deny this motion for the same reason as many of the above motions. Sani is not offering personal testimony about what Theresa's family members might have observed; he's just explaining the facts on which his opinion rested based on the medical records that he reviewed. Sani's point is that Theresa's medical records show her not reporting symptoms until nearly two weeks after the crash, which is not the typical course of disease for patients experiencing an mTBI. That's a reasoned medical opinion based on the records that Sani reviewed. If plaintiffs have evidence that call into question Sani's factual assumptions, then they are free to introduce that evidence and question Sani about it on cross-examination.

### C. Santos Reyes

Santos Reyes is a mechanical engineer who defendants retained to analyze the speed and force of the motor vehicle crash. Reyes offered two opinions: one about Slonaker's speed when he crashed into plaintiffs' vehicle, and one about the movement of plaintiffs' vehicle after the crash. Dkt. 56 (Reyes report). Plaintiffs move to exclude Reyes' testimony in full, asserting that Reyes is not qualified and that he did not use a reliable method to reach his opinions.

#### 1. Qualifications

The parties agree that Reyes has a Bachelor of Science in mechanical engineering, worked as a commercial refrigerator engineer for seven years, and then became a forensic mechanical engineer in 2021, focusing on vehicular accident reconstruction and mechanical design analysis. In his forensic role, Reyes attended technical training in crash analysis and

heavy vehicle event data interpretation. *See* Dkt. 56, at 21–23. Plaintiffs assert that Reyes is unqualified to offer his opinions because "his entire professional experience was in refrigeration," "[h]e has been employed in forensic work only since March 2021," and "he holds no advanced degree, no accreditation in accident reconstruction, and no certification from any accrediting body in that discipline." Dkt. 42, at 19.

The court will not exclude Reyes's opinion based on his qualifications. The court of appeals has instructed district courts to "consider a proposed expert's full range of practical experience as well as academic or technical training when determining whether that expert is qualified to render an opinion in a given area." *Smith v. Ford Motor Co.*, 215 F.3d 713 (7th Cir. 2000). Reyes has academic training as a mechanical engineer, which is relevant to the physics analysis he is performing here. He also has specific technical training in car crash analysis and practical experience gained through five years of forensic work. Further, the opinions Reyes offers involve relatively basic math, not detailed accident reconstruction techniques. Reyes is well-qualified to offer opinions at that level. *Gayton*, 593 F.3d at 617 (question is not whether an expert witness is qualified in general, but whether he is qualified to answer a specific question).

**2. Reliability of crash speed opinion**

After reviewing the parties' testimony about how the crash occurred and examining photographs of the vehicles involved, Reyes concluded that Slonaker's vehicle was travelling between five and eight miles per hour at impact. Plaintiffs seek to exclude this opinion on the ground that his bottom-line conclusion is unsupported and his method is unreliable.

Defendants don't meaningfully dispute that Reyes's bottom-line conclusion is unsupported. For reasons that Reyes doesn't explain, the minimum and maximum speed

numbers in the conclusion section of his report—that Slonaker was moving five to eight miles per hour at impact—are inconsistent with the minimum and maximum numbers in the analysis section of the report. In the analysis section, Reyes said that Slonaker's maximum speed at impact would have been nine miles per hour, not eight. Dkt. 56, at 13. He calculated that number using basic physic formulas, assuming that the cars were stopped six feet apart at a red light before the crash and that Slonaker accelerated at a constant rate of 0.46 g, the maximum acceleration for a vehicle capable of accelerating from zero to 60 miles per hour in six seconds. *Id.* And Reyes said that Slonaker's minimum speed at impact would have been 2.5 miles per hour, not five. His explanation for that number was that federal impact resistance regulations require front bumpers to maintain structural integrity during impacts up to 2.5 miles per hour, so the fact that Slonaker's front bumper was damaged suggests an impact greater than that.

Reyes's analysis supports a conclusion that Slonaker was travelling between 2.5 and nine miles per hour at the time of impact, but it does not support a conclusion that Slonaker was travelling five to eight miles per hour. The court will exclude the five-to-eight mile per hour conclusion. Reyes may testify to the 2.5-to-nine mile per hour conclusion.

In addition to the above problem, plaintiffs raise two other issues with Reyes's crash speed opinion.

First, plaintiffs challenge several of the assumptions underlying Reyes's calculations, asserting that they are indicative of an unreliable methodology. Specifically, plaintiffs say that Reyes did not explain why he assumed that Slonaker's vehicle would accelerate at a constant rate, that Reyes relied on Slonaker's estimate that the parties' vehicles were six feet apart before the crash without any further analysis, and that he simply assumed that federal bumper regulations for passenger vehicles apply to Slonaker's vehicle, even though that vehicle had

undergone a conversion to allow it to serve as a hearse. These are fair questions, but they concern the quality of the data that Reyes used, not the reliability of his method. *See Manpower, Inc. v. Ins. Co. of Pennsylvania*, 732 F.3d 796, 806 (7th Cir. 2013). ("Reliability . . . is primarily a question of the validity of the methodology employed by an expert, not the quality of the data used in applying the methodology or the conclusions produced."). They are not grounds to exclude Reyes's opinion.

Second, plaintiffs assert that Reyes's testimony about federal bumper standards should be excluded as irrelevant and confusing.[4] Plaintiffs assert that the fact "[t]hat the hearse's bumper was required to withstand a 2.5-mile-per-hour impact tells the jury nothing about the speed of this impact, and the fact that the bumper bar deformed anyway is if anything evidence of a greater force." Plaintiffs also say that there is a substantial risk "that a jury will treat a bumper-design threshold as a human-injury threshold." It's not entirely clear what plaintiffs are saying here. Reyes used the bumper standard to establish the *minimum* speed that Slonaker could have been going, noting that the bumper was deformed during the accident, so Slonaker must have going *more* than 2.5 miles per hour. So plaintiffs are correct that the deformed bumper is evidence of force greater than 2.5 miles per hour—that was Reyes's point. The court will not exclude the bumper standard as irrelevant or overly prejudicial.

In sum, the court concludes that Reyes's opinion that Slonaker was travelling between 2.5 and nine miles per hour at the time of the crash is admissible. Plaintiffs can test the assumptions underlying Reyes's calculations via cross-examination.

---

[4] Plaintiffs moved to exclude all of Reyes's opinions, including his opinion about the bumper standards, in their ninth motion in limine. But this argument appears in their twelfth motion in limine, in which they move again to exclude the bumper standards.

**3. Reliability of vehicle movement opinion**

Reyes also offered an opinion that plaintiffs' vehicle likely did not move forward enough during the crash to clear the crosswalk seven feet in front of the vehicle. Defendants want to offer this opinion to undermine Theresa Ferguson's credibility, because Theresa testified in her deposition that she was stopped in front of a crosswalk before the crash, and that after the crash, the front of her vehicle at minimum cleared the entire crosswalk. Dkt. 53 (Thersa Ferguson Dep. 36:3–6; 22–24).

To reach his conclusion about the movement of plaintiffs' vehicle after the crash, Reyes again relied on basic physics formulas for speed and acceleration. Reyes explained that if Slonaker hit plaintiffs' vehicle at eight miles per hour, plaintiffs' vehicle's immediate post-impact speed would have been four miles per hour. Dkt. 56, at 13. The crosswalk was seven feet and four inches wide, so the vehicle's deceleration would have to have been less than 0.09g to clear the crosswalk before stopping. 0.09g is less than the "average deceleration rate for passenger vehicles in the first six seconds at a controlled intersection," which is 0.19g. So Theresa's vehicle could not have cleared the crosswalk unless she had released her foot from the brake and let her vehicle roll across the intersection.

The court will exclude this opinion. Reyes's method relies on comparing Theresa's vehicle to the "average deceleration rate for passenger vehicles for the first six seconds at a controlled intersection." That's a fundamental problem, because this was a motor vehicle crash, not "average deceleration" at a "controlled intersection." Reyes doesn't explain whether cars that have been hit by other cars generally behave in the same way as cars at "controlled intersections," so he provided no reasoning to link the methodology he applied here with the factual circumstances.

**4. Other motions related to Reyes**

Plaintiffs filed three other motions related to Reyes's testimony.

First, in their tenth motion in limine, plaintiffs seek to limit Reyes to just the two opinions that he offered in his report. The court will deny that motion as unnecessary. Plaintiffs don't identify any specific testimony that they want to exclude, so they are essentially reiterating Federal Rule of Civil Procedure 26(a)(2)(B).

Second, in their eleventh motion in limine, plaintiffs again ask to exclude Reyes's opinion about the movement of Theresa's vehicle, this time on grounds other than Rule 702. The court already determined that that opinion is inadmissible under Rule 702, so the court will deny that motion as moot.

Third, in their twelfth motion in limine, plaintiffs seek to bar Reyes from relying on federal bumper standards or from describing the motor vehicle crash as "minor" or "low-speed." The court denied the motion to exclude the bumper standards above. The court will also deny the motion to prevent Reyes from describing the accident as "minor" or "low-speed." In his report, Reyes uses these terms only in passing as shorthand to refer to his conclusions about the speed of the crash. The court will not police the word choice of either party's witnesses in describing the crash.

ORDER

IT IS ORDERED that:

1. Defendants' motion to exclude the testimony of Brian Greenwald, Dkt. 31, is GRANTED.

2. The court rules on plaintiff's motions in limine to exclude certain testimony of defendants' expert Sepehr Sani, Dkt. 42, as follows:

a. Plaintiffs' first motion in limine to exclude testimony that Theresa's diagnosis was "copy and pasted,' Dkt. 42, is DENIED.

b. Plaintiffs' second motion in limine to exclude testimony about the nature of the crash, Dkt. 42, is DENIED.

c. Plaintiffs' third motion in limine to exclude psychiatric opinions, Dkt. 42, is GRANTED as unopposed.

d. Plaintiffs' fourth motion in limine to exclude testimony about alternate causes, Dkt. 42, is GRANTED in part and DENIED in part. Sani may not testify about alternate causes of Theresa's symptoms unless he is asked about it on cross-examination.

e. Plaintiffs' fifth motion in limine to exclude opinions about Theresa's functioning, Dkt. 42, is GRANTED as unopposed.

f. Plaintiffs' sixth motion in limine to exclude references to Sani being an independent expert, Dkt. 42, is GRANTED as unopposed.

g. Plaintiffs' seventh motion in limine to exclude undisclosed materials, Dkt. 42, is DENIED.

h. Plaintiffs' eighth motion in limine to exclude testimony about family member observations, Dkt. 42, is DENIED.

3. The court rules on plaintiff's motions in limine to exclude testimony of Santos Reyes, Dkt. 42, as follows:

a. Plaintiffs' ninth motion in limine to exclude all opinions of Santos Reyes under Rule 702, Dkt. 42, is GRANTED in part and DENIED in part. Reyes may not testify that Slonaker's car was going five to eight miles per hour at the time of the crash, and he may not testify about plaintiffs' vehicle's post-crash movement. He may testify that Slonaker's vehicle was going between 2.5 and nine miles per hour at the time of the crash.

b. Plaintiffs' tenth motion in limine to limit Reyes to the opinions in his report, Dkt. 42, is DENIED as unnecessary.

c. Plaintiffs' eleventh motion in limine to exclude Reyes's opinion that Theresa may have released her brake, Dkt. 42, is DENIED as moot.

d. Plaintiffs' twelfth motion in limine to bar Reyes from testifying that the accident was "minor" or "low-speed" and to exclude federal bumper standards, Dkt. 42, is DENIED.

Entered September 18, 2026.

BY THE COURT:

/s/

JAMES D. PETERSON
District Judge